

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-034-CV

IN THE INTEREST OF J.R.S, J.L.S.,
AND B.L.N.S.

------------

FROM THE 90TH DISTRICT COURT OF YOUNG COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

Appellant Melissa S. appeals the trial court's judgment terminating her parental rights to her three children—Julia, James, and Bethany (collectively "children").[2]  Melissa argues that the trial court erred by failing to grant her

---

[1] *See* Tex. R. App. P. 47.4.

[2] Pursuant to Texas Rule of Appellate Procedure 9.8(b)(2), we use aliases for the names of the children.

motion for continuance, that the evidence is legally and factually insufficient to support the trial court's family code section 161.001(1) termination ground findings, and that the evidence is legally and factually insufficient to support the trial court's finding that termination of Melissa's parental rights to the children is in the children's best interest. We affirm.

## II. Factual and Procedural Background

At age fifteen, Melissa gave birth to Julia. Melissa lived with her mother in Indiana when Julia was born. Melissa last saw Julia's father, Enrique O., when she was pregnant with Julia. Melissa signed a provisional custody agreement that allowed her mother to make various decisions for Julia, who was diagnosed with epilepsy at age five. Julia was sixteen years old at the time of trial.

Melissa was sixteen year's old when she, Julia, and Melissa's mother moved to Louisiana. There, still at age sixteen, Melissa met and married George G. Melissa subsequently separated from George G., moved to Dallas, met Beto M., had a two-year relationship with Beto, and gave birth to James in July 1995 in Louisiana.[3] Melissa learned after James's birth that George had

---

[3] James, who is Beto's son, was born two and one-half months premature, weighing approximately two pounds, thirteen ounces.

2

divorced her. Melissa is unaware of Beto's whereabouts. James was twelve years old at the time of trial.

Melissa moved back to Dallas about a year after James's birth. Julia and James remained in the care of Melissa's mother. In November 1997, Melissa gave birth to her third child, Bethany, back in Louisiana. At trial, Melissa could not articulate Bethany's father's name, nor did she know what he did for a living, despite claiming to have had a two-year relationship with him. Bethany was ten years old at the time of trial.

Melissa never graduated from high school. She lived with her mother in Louisiana after Bethany was born. She did not have a job, but she drew SSI benefits and received WIC payments and Medicaid. Approximately four years after Bethany's birth, Melissa moved back to Texas "to live on her own," and she worked as a waitress. Julia, James, and Bethany remained in Louisiana under Melissa's mother's care. Melissa left the children in her mother's care because Melissa did not have the means to take care of them, and she knew that they would have a roof over their heads. Melissa visited the children and sent them money.

After living in Dallas for approximately eighteen months, Melissa moved back to Louisiana to live with her mother because her mother was sick and she

3

needed help caring for Julia.[4]  Melissa did not have a job when she moved back to Louisiana.

In October 2002, Melissa's mother and the children moved to Graham, Texas, to live with Vickie and Lester M.[5] because Melissa's mother was sick and needed care.  Melissa had last signed a provisional custody agreement in 2001, and she was "pissed" about the move because she "didn't have a say at all" in her mother's decision to move to Texas with the children.  Melissa called Legal Aid and the Sheriff's Department for assistance.  However, she never went to Texas to pick up the children, and she eventually "let it go" because she "knew [her] mom could take care of [the children].  They were in good hands."  Melissa moved to Dallas two weeks later.  Melissa visited the children in December 2002.

Melissa's mother died in March 2003.  Thereafter, Vickie and Lester M. filed suit, and the trial court signed an order in September 2003 that appointed them and Melissa joint managing conservators of the children and gave Vickie and Lester M. the exclusive right to designate the primary residence of the children within Young County.  Vickie and Lester M. had care, custody, and

---

[4] Julia suffered seizures.

[5] Lester M. is Melissa's uncle.

control of the children. The order also required Melissa to pay to Vickie and Lester M. monthly child support in the amount of $100, and it awarded Melissa monthly visitation with the children. Melissa did not make the child support payments.

After entry of the order, Melissa visited the children in July 2004, December 2004, and July 2005. She had little or no transportation that allowed her to visit the children. Vickie M. told her that she could not see the children, and Melissa did not have enough money to hire an attorney to represent her interests regarding the children. Melissa, however, never moved to Graham to be close to her children. According to her, "I didn't want to [move to Graham]. I wanted to live elsewhere."

Appellee, the Texas Department of Family and Protective Services ("TDFPS"), removed the children from Vickie and Lester M.'s residence on August 3, 2006, after Vickie M.—claiming that she was having trouble controlling them and that she could not handle them anymore—delivered the children to TDFPS. Following an investigation, TDFPS found that there was "reason to believe" for physical abuse and for the refusal of parental responsibility.[6] Melissa admitted that when Vickie M. turned the children over

---

[6] Melissa testified that she heard family violence involving one or more of the children occurred at Vickie and Lester M.'s residence.

to TDFPS, Melissa "did not have the means of a living, no, I did not.  And I did not want them [the children] in my possession at the time anyway because I didn't have nowhere else to put them as far as household."

Melissa participated with TDFPS to develop a service plan.  She took a psychological exam early in the case, but she did not complete her plan (which included taking another psychological exam and completing parenting classes and counseling sessions) until the latter part of 2007, after an extension.

After the children's removal, Melissa moved to Houston in January 2007; she moved to Irving in late February 2007; she moved to Oklahoma in March, April, or May 2007; and she moved back to Irving in July 2007.  Melissa visited the children once in October 2006 and once in December 2007.[7]  She failed to show up for visits with the children on February 1, 2007, and September 11, 2007, and she contended that the trial court prohibited her from visiting the children from late February 2007 to June 2007.

Trial was to the bench in January 2008.  Melissa testified that she lives with Cheryl S. (her "godmother"), that she had started working at a restaurant three months before trial, and that she had applied for housing with the Dallas

---

[7] Melissa did not visit the children between July 2005 and October 2006.

6

Housing Authority, but she acknowledged that she does not have transportation and that she does not have a place for the children to live.

The trial court subsequently signed an order terminating Melissa's parental rights to Julia, James, and Bethany.[8] The trial court found by clear and convincing evidence that termination of Melissa's parental rights to the children was in the children's best interest and that Melissa had (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being, (3) constructively abandoned the children, and (4) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children. *See* Tex. Fam. Code Ann. §§ 161.001(1)(D), (E), (N), & (O), 161.001(2) (Vernon 2008). The trial court further ordered that TDFPS be appointed permanent managing conservator of the children. This appeal followed.

### III. Motion for Continuance

---

[8] The trial court also terminated the parental rights of all three of the alleged fathers of the children.

7

In her first issue, Melissa argues that the trial court erred by failing to grant her motion for continuance. She contends that she did not receive proper notice of the final trial setting as required by Texas Rule of Civil Procedure 245 because neither she nor her attorney were present at an October 5, 2007 permanency hearing when the first notice of the final trial setting was made and because her attorney, who she states was appointed on December 11, 2007, did not receive notice "until some date in December after December 11, 2007."

Rule 245 provides in part as follows:

> The Court may set contested cases on written request of any party, or on the court's own motion, with reasonable notice of not less than forty-five days to the parties of a first setting for trial, or by agreement of the parties; provided, however, that when a case previously has been set for trial, the Court may reset said contested case to a later date on any reasonable notice to the parties or by agreement of the parties.

Tex. R. Civ. P. 245. The forty-five day notice provision is mandatory. *Custom-Crete, Inc. v. K-Bar Servs., Inc.*, 82 S.W.3d 655, 659 (Tex. App.—San Antonio 2002, no pet.). But it applies only to the first setting of the trial. *State Farm Fire & Cas. Co. v. Price*, 845 S.W.2d 427, 431–32 (Tex. App.—Amarillo 1992, writ dism'd). Whether the trial court grants or denies a motion for continuance is within its sound discretion. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner, without reference to guiding rules and

8

principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986).

The trial court signed a permanency hearing order on June 22, 2007, that set October 5, 2007, as the final trial date. The order indicates that Melissa "appeared in person and announced ready." On October 5, 2007, the trial court signed a permanency hearing order that reset the final trial date for January 14, 2008. The order does not indicate that Melissa was present. On October 24, 2007, the trial court signed an order appointing Jeff Eaves to represent Melissa. Melissa states in her brief that her lawyer did not receive notice of the termination matter "until some time in December after December 11, 2007." The termination trial commenced on January 14, 2008.

Because June 22, 2007, was not less than forty-five days before January 14, 2008, Melissa received notice of the *first* trial setting as required by rule 245. *See* Tex. R. Civ. P. 245. Assuming that Melissa's counsel received notice of the *reset* final trial setting "some date in December after December 11, 2007," and considering the entire record, Melissa received reasonable notice of the January 14, 2008 reset final hearing as required by rule 245. *See*

*id*.[9]  Accordingly, we hold that the trial court did not abuse its discretion not granting Melissa's motion for continuance.  We overrule Melissa's first issue.

## IV.  Evidentiary Sufficiency

In her second, third, fourth, fifth, and sixth issues, Melissa argues that the evidence is legally and factually insufficient to support the trial court's family code section 161.001(1) termination ground findings and section 161.001(2) best interest finding.

### A.    Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  "While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that

---

[9] We note that the record demonstrates that the trial court signed an order on October 5, 2007, consolidating the termination case with an action seeking to recover Melissa's child support arrearage under cause number 29,907.  Melissa's attorney appeared on behalf of Melissa in cause number 29,907 as early as November 14, 2007, two months before the final trial.

right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)6. In a termination case, the State seeks not just to limit parental rights but to erase them permanently — to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App. — Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or

conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2002). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on

the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provision of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**B.    Constructive Abandonment Finding**

A parent constructively abandons a child when (1) the child has been in the permanent or temporary managing conservatorship of TDFPS or an authorized agency for not less than six months, (2) TDFPS or the authorized agency has made reasonable efforts to return the child to the parent, (3) the

13

parent has not regularly visited or maintained significant contact with the child, and (4) the parent has demonstrated an inability to provide the child with a safe environment. Tex. Fam. Code Ann. § 161.001(1)(N); *In re A.S.*, 261 S.W.3d 76, 88–89 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The only constructive abandonment requirement Melissa challenges is the requirement that TDFPS make reasonable efforts to return the children to her. As TDFPS points out, this court and others have reasoned that TDFPS's preparation and administration of a service plan for the parent constitutes evidence that TDFPS made reasonable efforts to return the child to the parent. *See, e.g., In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.); *In re S.S.*, No. 11-05-00083-CV, 2006 WL 1285125, at *2–3 (Tex. App.—Eastland May 11, 2006, no pet.) (mem. op.).

The record demonstrates that Melissa participated with TDFPS to develop a service plan. She signed the "Family Service Plan" on October 25, 2006. The service plan specifically states that its "purpose is to help you provide your child with a safe environment within the reasonable period specified in the plan." It further states that TDFPS (CPS) will evaluate Melissa's progress on the basis of Melissa's "successful achievement of the goals stated in this plan," "successful completion of the tasks in this plan," and "ability to provide for the ongoing safety and well-being of your children." The service plan required that

14

Melissa complete parenting classes, a psychological evaluation, counseling sessions, and drug screens. On October 27, 2006, the trial court signed a status hearing order providing in part that the service plan is reasonable, accurate, and in compliance with the previous orders of the court and, significantly, that the plan "adequately ensure[s] that reasonable efforts are being made to enable the parent to provide a safe environment for the children."

Melissa argues that TDFPS "did not make reasonable efforts to assist [her] with her transportation issues in an effort to facilitate her visitation with the children, nor did [TDFPS] assist her in an effort to make the visitation take place at a location more accessible to Melissa." But April Mancilla, the CPS caseworker assigned to Melissa's case, testified that Melissa never requested transportation services from TDFPS. Mancilla also testified that Melissa did not notify her of the approximately six moves that Melissa made during the pendency of the case, that it was difficult to locate Melissa, and that it was difficult to work with Melissa with regard to her performing services. Mancilla stated that TDFPS offered services early in the case, but Melissa did not complete her services until the latter part of 2007. According to Mancilla, Melissa expressed throughout the whole case that she wanted to place her

15

children with her sister, who lives in Louisiana. It was not until October 2007 that Melissa "decided that she was going to work services."

Additionally, Melissa testified that she accomplished many of her moves and visited her children when living away from them with the help of friends, by taking a Greyhound bus, or by driving her own car when she owned it. She testified:

> [TDFPS attorney]: So you were able to get transportation when you needed to get transportation?
>
> [Melissa]: Yes.

The decision to not live closer to her children was Melissa's decision. According to her, she never moved to Graham to be close to her children because she "didn't want to [move to Graham]. [She] wanted to live elsewhere."

Based on our review of the entire record, we conclude that a factfinder could reasonably have formed a firm belief or conviction that TDFPS made reasonable efforts to return the children to Melissa. Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's section 161.001(1)(N) finding that Melissa constructively abandoned her children. *See* Tex. Fam. Code Ann. § 161.001(1)(N). We overrule Melissa's fourth issue.

16

Because we affirm the trial court's section 161.001(1)(N) finding, we need not address Melisssa's second, third, and fifth issues challenging the sufficiency of the evidence to support the trial court's section 161.001(1)(D), (E), and (O) findings. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (providing that only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest).

## C.    Best Interest Finding

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

17

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or the proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Here, Julia informed the trial court that she thought Melissa should "get her rights to us [the children]," that she would feel safe living with Melissa, and that she would be happiest if the judge "[p]ut me back with my mama." James told the trial court that he wanted to live with Melissa because he has not lived with her in a long time. Melissa offered into evidence two notes from the children. They state, among other things, "Hope you stay away from smoking

18

and I hope that you come through with your services and I hope you get us back," "I love you and miss you and want to go home with you," "Your loving children forever," and "We love you, Mommy."

Melissa testified that she has taken steps to become a responsible parent, including getting a job, applying for housing, and trying to work something out for transportation. Melissa opined that she is able to both physically and emotionally take care of the children, that "this process" has matured her, that she relates with her children well, and that her godmother provides her with a support system.

Mancilla, however, opined that it is in the children's best interest that Melissa's parental rights be terminated. She testified that the children need stability, permanency, and consistency; that they need a home that they can go to; and that they need to have food to eat. Mancilla thought that Melissa had not developed the parenting skills and abilities necessary to take care of the three children. She testified that Melissa did not currently have a clean and safe environment for the children to live in, that Melissa did not demonstrate to TDFPS that the choices she had been making were good choices, that she had no indication from Melissa's testimony that Melissa is emotionally stable, that Melissa could not adequately take care of the emotional and physical needs of the children, that she does not think that Melissa will get the children to the

19

doctor's office when they need to go, and that she does not think that Melissa has the parenting ability to parent the children. Melissa acknowledged that she does not have transportation and that she does not have a place for the children to live.

Mancilla agreed that Melissa has made numerous excuses for her behavior instead of taking responsibility for her actions, including that Melissa had a drunk father, that she became pregnant at age fifteen and eighteen, that she was kicked out of school at age fifteen, that she has no transportation and no home, and that she lives on disability.

Mancilla testified that all three of the children are doing "great" and that they are comfortable in their current placements. She agreed that the children have never had a consistent caregiver and that the last year and one-half (the pendency of Melissa's case) has probably provided the children with the most consistent care that they have ever had.

Frank Gellner is the guardian ad litem for the children. He visited the children at least every three months during his tenure as guardian ad litem. He agreed that Julia, the eldest sibling, felt like she was the "mother figure" in the lives of her two siblings. Gellner did not think that it would be a good idea to return the children to Melissa, and he recommended that Melissa's parental rights be terminated.

20

The factors—including the emotional and physical needs of the children now and in the future, the emotional and physical danger to the children now and in the future, Melissa's parental abilities, the stability of the home, and Melissa's excuses for her acts or omissions—support the trial court's finding that termination of the parent-child relationship is in the children's best interest. *See Holley*, 544 S.W.2d at 371–72.

Based on our review of the entire record, we conclude that a factfinder could reasonably have formed a firm belief or conviction that termination of Melissa's parental rights to Julia, James, and Bethany is in Julia's, James's, and Bethany's best interest. Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's section 161.001(2) best interest finding. *See* Tex. Fam. Code Ann. § 161.001(2). We overrule Melissa's sixth issue.

## V. Conclusion

Having overruled Melissa's first, fourth, and sixth issues, her dispositive issues, we affirm the trial court's order terminating Melissa's parental rights to Julia, James, and Bethany.


BOB MCCOY
JUSTICE

PANEL: GARDNER, WALKER, and MCCOY, JJ.

21

DELIVERED: February 5, 2009